[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11709
_____

D.C. Docket No. 8:13-cv-00536-MSS-TBM


DONNA TRASK,
ANITA TRUITT,

Plaintiffs-Appellants,

versus

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 5, 2016)

Before HULL, JULIE CARNES, and CLEVENGER,[*] Circuit Judges.

HULL, Circuit Judge:

Plaintiffs Donna Trask and Anita Truitt (the "plaintiffs") appeal the district court's order granting summary judgment in favor of the Secretary for the Department of Veterans Affairs ("VA") in their employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 626.  On appeal, the plaintiffs argue that the district court erred by making improper fact determinations and incorrectly applying the relevant law.  After review, and with the benefit of oral argument, we affirm.[1]

## I.    RELEVANT BACKGROUND FACTS

In this case the plaintiffs sued their employer, the VA, for gender and age discrimination.  The plaintiffs are pharmacists who have worked for the VA for over a decade.  In 2010, the VA announced a nationwide treatment initiative that resulted in the reorganization of several VA treatment facilities, including the facility where the plaintiffs worked.  This reorganization involved the creation of

---

[*]Honorable Raymond C. Clevenger, United States Circuit Judge for the Federal Circuit, sitting by designation.

[1]We review de novo the district court's grant of summary judgment, viewing all evidence in the light most favorable to the non-moving party.  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We may affirm on any ground that finds support in the record. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007).

2

new pharmacist positions requiring an "advanced scope of practice," to be filled internally, and the elimination of certain pre-existing pharmacist positions, including the positions that the plaintiffs held.

The plaintiffs claim they were not selected to fill the new pharmacist positions due to their gender and age and were similarly denied opportunities to train and qualify for those positions due to their gender and age. The VA's non-selection of the plaintiffs for the new pharmacist positions, along with its reorganization and elimination of the plaintiffs' then-current positions, resulted in a reassignment of the plaintiffs' positions and job duties. The plaintiffs claim their reassignments resulted in losses of prestige and responsibility. The plaintiffs have suffered no decrease in pay and are still employed by the VA.

We recount below the plaintiffs' training and credentials, as well as their experience and performance as pharmacists. We then discuss the VA's creation and implementation of the treatment initiative that gave rise to the new pharmacist positions and discuss the objective qualifications required to fill those positions. Finally, we recount the plaintiffs' unsuccessful attempts to qualify for and fill the new pharmacist positions.

## A.    The Plaintiffs and their Supervisors

Dr. Donna Trask, a female born in 1953, is a licensed clinical pharmacist. At the time of the events material to this appeal, Dr. Trask was approximately 58

years old.  Dr. Trask obtained a Bachelor of Pharmacy Degree in 1975, and a Doctor of Pharmacy Degree in 2002.  Over her decades-long career as a clinical pharmacist, Dr. Trask has gained extensive experience monitoring medication distribution, establishing drug handling procedures, maintaining prescription records, training pharmacy personnel, educating and consulting patients, and making medication recommendations to physicians for all types of diseases and medical conditions, commonly referred to as "disease states."

In 2010, Dr. Trask obtained a certificate in Medication Management Therapy, which indicates expertise in several areas, including disease state management and selecting, initiating, and modifying medication therapy.  In 2011, Dr. Trask obtained board certification as a geriatric pharmacist, which demonstrated competence in over 100 disease states in the senior population. Dr. Trask has also taught classes in pharmacology.

Dr. Anita Truitt, a female born in 1955, is also a licensed clinical pharmacist.  At the time of the events material to this appeal, Dr. Truitt was approximately 55 years old.  Dr. Truitt obtained a Bachelor of Science Degree in Pharmacy in 1978, and a Doctor of Pharmacy Degree in 2003.  Throughout her decades-long career as a pharmacist, her job duties have required her to counsel and educate patients in several disease states.

In 2002, the plaintiffs began working as clinical "float" pharmacists for Bay Pines VA Healthcare System ("Bay Pines"). In 2003, they received assignments as "module" pharmacists. Bay Pines is split into 4 "modules," all of which provide primary care. Dr. Trask worked in Module D and Dr. Truitt worked in Module B.

The plaintiffs had all the same supervisors. Their first-line supervisor was Dr. Robert Stewart, a male in his 40s. Their second-line supervisors, each an Associate Chief of Pharmacy, were Dr. Keri Justice, a female in her 30s, and Dr. Camaro West-Lee, a female in her 40s. Their third-line supervisor was the Bay Pines Chief of Pharmacy, Dr. Gary Wilson, a male in his 50s.

**B.    The Plaintiffs' Duties and Performance as Module Pharmacists**

Dr. Trask testified that her duties as a module pharmacist involved monitoring labs, calculating dosages, conducting extensive patient interviews, evaluating non-formulary drug requests, training personnel and new pharmacists, and making informed medication recommendations to physicians. When providing treatment, Dr. Trask would typically interview the patient, evaluate his medical history, look for changes in the patient, consider modifications to medication, screen for contraindications, and educate the patient. Dr. Trask believed she performed all the duties of a mid-level provider.

Apart from providing primary care, Dr. Trask collaborated with several patient-centered care teams in Module D including the Spinal Cord Injury Team,

the Traumatic Brain Injury Team, and the Post-deployment team for veterans returning from Iraq and Afghanistan. Dr. Trask received specialized training and testified that she was the Bay Pines pharmacy service's "expert in spinal cord injury." Dr. Trask received an "exceptional" rating on all her performance reviews and never had a complaint filed against her.

Dr. Truitt testified that her duties as a module pharmacist involved managing patients' medications and recommending certain drug therapies to physicians. She testified that more than 50% of her module practice at Bay Pines involved disease state management. Dr. Truitt also trained newly hired doctors and pharmacists and served as a preceptor for pharmacy students at a nearby college. Dr. Truitt received exceptional performance reviews for her work as a module pharmacist.

While the plaintiffs contended that they were doing most of the duties of a mid-level provider, the admitted that they never signed prescriptions in their own names. In fact, module pharmacists at Bay Pines never prescribed, managed, or monitored medications independent from a physician.

## C.    Advanced Scope of Practice

Bay Pines pharmacists have the ability to hold either a general scope of practice or an advanced scope of practice ("advanced scope"). A general scope of practice, held by all clinical pharmacists, entails general pharmaceutical duties, such as processing prescriptions and using clinical judgment to follow lab work.

An advanced scope allows a pharmacist to prescribe medications for a specific disease state within their practice, such as diabetes, hypertension, and hyperlipidemia.

While there are several types of advanced scopes, the defining feature of most is that they allow pharmacists to independently write prescriptions without a doctor's approval. Thus, pharmacists with advanced scopes function "very much like a physician or an advanced provider, a nurse practitioner, or a . . . physician's assistant."

To obtain an advanced scope, a clinical pharmacist must obtain approval from the Bay Pines Pharmacy Professional Standards Board ("Standards Board"). The Standards Board looks at two criteria: (1) whether the pharmacists' job requires an advanced scope, and (2) whether the pharmacist is qualified and credentialed to hold an advanced scope. Obtaining and maintaining an advanced scope requires long-term peer review from multiple supervisory pharmacists. As such, the Standards Board does not grant advanced scopes "unless they are a requirement of the job area and job description in which someone practices."

A pharmacist could initiate the process for obtaining an advanced scope by speaking with his or her supervisor. The supervisor would then submit a request to the credentialing department, which would provide the necessary paperwork, including an "Advanced Scope of Practice and Prescriptive Authority

7

Application." The application was a short document that required the applicant to check a few boxes, sign, and date. The application also contained a section for signatures from "collaborating" physicians, who would indicate their approval or disapproval of the applicant's receipt of an advanced scope.

The Standards Board reviewed all advanced scope applications. At the time material to this appeal, the Standards Board committee consisted of Dr. Stewart and seven other individuals. Dr. Justice was the Chairperson of the Standards Board. Once the Standards Board had reviewed the application and interviewed the relevant supervisory pharmacists, it would reach a final decision, subject to Dr. Wilson's approval.

The plaintiffs did not have advanced scopes. As module pharmacists, their jobs did not require one. Dr. Trask was unaware of any person receiving an advanced scope who did not have an assignment requiring one.

Without an advanced scope, the plaintiffs lacked authority to independently prescribe medications to manage patients' diseases. As Dr. Truitt recognized, "[T]echnically we could not make the change [in medications] without the doctor's approval in making that change." Dr. Trask similarly testified, "I made recommendations all day long. I couldn't put it in my name because I didn't have an advanced scope."

8

### D.     Patient Aligned Care Teams

In the spring of 2010, the VA Central Office announced a nationwide initiative known as "Patient Aligned Care Teams," or "PACT."  The goal of PACT was to develop a patient-centered, team-based approach to health care.  PACT was intended to replace episodic care based on illness and patient complaints with coordinated care and long term healing relationships.

Each PACT team consists of a provider, such as a physician, nurse practitioner, or physician assistant, a licensed practical nurse, a clerk, and other team members, such as clinical pharmacists, social workers, and dieticians.  PACT required each team member to function at his or her "highest" licensed capacity in order to provide complete care to the patient.  In PACT, the pharmacist would function as a mid-level provider who managed chronic disease sates, made critical decisions about the patient's care, and prescribed medications.  A PACT pharmacist needed to function under an advanced scope so that he or she could independently prescribe medication.

### E.     PACT Pilot Program at Lakeside Clinic

In April 2010, Bay Pines initiated a series of pilot programs to test the implementation of the PACT initiative.  One of the pilot programs was at the Lakeside Clinic ("Lakeside")—a standalone primary care area not located within the central Bay Pines modules.  Dr. Larry Atkinson, the acting Chief of Primary

9

Care, and members of the Bay Pines PACT executive council chose Lakeside as the pilot site.[2]  They chose Lakeside because it had available space, it was close to the primary care administrative offices, and the providers there had been involved with PACT from its inception.

Dr. Brian Steele, a male in his 30s, was working as a module pharmacist at Lakeside when it was chosen as a pilot program site.  Management selected Dr. Steele to participate in the pilot program because he was already working with the physicians selected to participate in the pilot program.  Dr. Steele also had several nationally recognized certifications that were valuable for pharmacists wishing to participate in PACT.

Dr. Steele's participation in the pilot program required him to have an advanced scope so that he could perform the responsibilities of a PACT pharmacist.  But at the time the pilot program commenced, Dr. Steele was not qualified to receive an advanced scope.  Rather than move a clinical pharmacy specialist with an advanced scope to Lakeside, Bay Pines decided to "embrace the pilot" and train Dr. Steele.

After several months of training in the disease management clinic, Dr. Steele applied for an advanced scope.  Dr. Steele received an advanced scope in January 2011 on the grounds that his participation in the Lakeside pilot program required it.

---

[2]While Dr. Justice was on the PACT executive council, she did not have direct responsibility for choosing that pilot site.

10

### F.    PACT Implementation Plan

On February 10, 2011, pharmacy management held a meeting with the module pharmacists.  Dr. Justice announced that the module pharmacists would remain in their positions and transition into becoming PACT pharmacists.  Pharmacists who already had advanced scopes would mentor the module pharmacists, such as the plaintiffs, in disease state management to prepare them for their new roles as PACT pharmacists.  This initial plan pleased the plaintiffs, as they would keep their jobs, receive training, presumably obtain advanced scopes, and eventually become PACT pharmacists.

At the end of February 2011, Dr. Justice and Dr. Wilson attended a meeting between the chiefs of multiple VA medical centers within their region and their regional leaders.  Roy Coakley, a regional leader who had recently met with Richard Stark, the so-called "father of PACT," attended the meeting.  At the meeting, Dr. Justice and Dr. Wilson sought guidance from Coakley and others regarding Bay Pine's PACT implementation plan.  After speaking with Coakley and other pharmacy chiefs, Dr. Wilson learned that training module pharmacists as PACT pharmacists was not best practice.  Rather, pharmacists who already had experience providing mid-level care with advanced scopes should be considered for the PACT positions "in order to provide the best possible care to the patients."

11

On March 3, 2011, based on the advice they received at the February 2011 meeting, Dr. Wilson and Dr. Justice announced a revision to the PACT implementation plan. Rather than leaving the current module pharmacists in place and training them to become PACT pharmacists, management allowed all Bay Pines pharmacists to apply for a PACT pharmacist position.

On May 19, 2011, Dr. Wilson sent an email to all Bay Pines pharmacists announcing that the time had come to "reorganize" and "implement PACT . . . throughout the Bay Pines Healthcare System." Dr. Wilson stressed that "[m]ultiple national initiatives" were guiding their restructuring decision, which would require "reassigning pharmacists, relocating workload and maximizing efficiency." Dr. Wilson noted that the PACT model required "strong clinicians," and that "Central Office . . . established the qualification standards that each clinician should possess."

The email contained a reorganization table that announced the creation of seven PACT positions—two at Module B, two at Module D, two at Lakeside, and one at the Palm Harbor Community-Based Outpatient Clinic, another part of Bay Pines. In July 2011, Human Resources formally posted to the USA Jobs website the PACT positions opening at Module B, Module D, and Lakeside. At that time, the Palm Harbor position had not yet been approved, so the July 2011 USA Jobs postings included only the six main-campus positions.

12

## G.    PACT Applicants and Selections

Twelve Bay Pines pharmacists, including the plaintiffs and Dr. Steele, applied for the six PACT positions formally posted on USA Jobs in July 2011. Among the applicants was Dr. Linda Rolston, a female in her mid-50s. Dr. Rolston obtained an advanced scope in 1988. Dr. Rolston believed she had applied for the PACT position initially planned for Palm Harbor, but did not realize that the July 2011 USA Jobs posting included only the six positions at the main campus. Dr. Justice informed Dr. Rolston that the Palm Harbor position was not yet approved. Dr. Justice nevertheless offered Dr. Rolston one of the PACT positions at the main campus. Dr. Rolston declined the offer and told Dr. Justice she would like to be reconsidered when the Palm Harbor position became available.

In September 2011, Bay Pines selected six applicants to fill the PACT pharmacist positions. Dr. West, Dr. Justice, and Dr. Stewart provided input, but Dr. Wilson was the ultimate selecting official. The six applicants chosen for the PACT positions were Hetal Bhatt-Chugani, Will Lavinghousez, Brian Steele, Rodrique Rodney, Germain Thomas, and Michael Kelley. Each of the selected pharmacists possessed an advanced scope in disease state management prior to applying for the positions.

13

The five applicants not selected were the two plaintiffs and three others, Peter Pasek, Natalia Schwartz, and Timothy Ebert. Pasek and Schwartz both already possessed an advanced scope in disease state management prior to applying for the positions. The plaintiffs and Ebert were the only applicants who did not have advanced scopes when they applied. Dr. Wilson did not select the plaintiffs primarily because they did not have advanced scopes, and they did not have experience prescribing medicine under an advanced scope.

Bay Pines' PACT pharmacist selections are summarized in the following table:

| Name/Approximate Age in 2011/Gender | Application Outcome | Possession of Advanced Scope? |
|---|---|---|
| Hetal Bhatt-Chugani/33/F | Selected | Yes |
| Will Lavinghousez/30/M | Selected | Yes |
| Linda Rolston/54/F | Selected, but withdrew | Yes |
| Brian Steele/32/M | Selected | Yes |
| Rodrique Rodney/28/M | Selected | Yes |
| Germain Thomas/31/F | Selected | Yes |
| Michael Kelley/29/M | Selected | Yes |
| Peter Pasek/28/M | Not Selected | Yes |
| Natalia Schwartz/(young)/F | Not Selected | Yes |

14

| Timothy Ebert/26/M | Not Selected | No |
|---|---|---|
| Donna Trask/58/F | Not Selected | No |
| Anita Truitt/55/F | Not Selected | No |

## H.    Plaintiffs' Attempts to Obtain Advanced Scopes and Receive Training

The plaintiffs attempted to obtain advanced scopes and receive related training on several occasions. Soon after the VA Central Office announced the PACT initiative, Plaintiff Dr. Trask told Dr. Justice that she wanted whatever training and education would be necessary to perform a PACT position, including obtaining an advanced scope. Dr. Justice responded, "Oh, we'll get that later." Dr. Trask mentioned her desire to obtain an advanced scope to Dr. Justice several more times, but was repeatedly "put off." According to Dr. Justice, at the time Dr. Trask initially requested an advanced scope, and the several times thereafter, her module was not operating under PACT and, therefore, she did not need an advanced scope.

In April 2011, a few months before PACT selections were made, Dr. Ernest Baul, the primary care provider for spinal cord injury patients, asked Dr. Trask to obtain an advanced scope in order to help treat spinal cord injury patients. The advanced scope would allow Dr. Trask to write orders for soft prosthetics and assist with lipid management. Dr. Trask informed Dr. Stewart of Dr. Baul's request, and asked him to initiate the process for obtaining an advanced scope with

15

the credentialing department.  Dr. Stewart's request got passed on to Dr. Justice, who said she was on administrative leave and would not be able to review the matter until mid-May.  Dr. Justice ultimately denied Dr. Baul's request for Dr. Trask to receive an advanced scope on the grounds that Dr. Baul already had access to pharmacists who had advanced scopes and were better suited to help him.

In July 2011, the plaintiffs attempted to obtain advanced scope applications on their own, but management refused to provide the applications, or any guidance on how to obtain one.  The plaintiffs ultimately obtained the application with the assistance of a union representative.

On or about July 25, 2011, the plaintiffs completed their written advanced scope applications.  The applications required written recommendations from collaborating physicians.  All six of the Module D physicians recommended approval of Dr. Trask's request for an advanced scope.  Two of the six Module B physicians recommended approval of Dr. Truitt's request for an advanced scope.  Apart from signing the applications, several physicians testified that both plaintiffs were highly regarded and well-qualified to receive advanced scopes.  In other words, several treating physicians believed that, based on their extensive experience, the plaintiffs were qualified to independently prescribe medications under supervision.

16

The Standards Board held the plaintiffs' July 25, 2011 applications until after the PACT pharmacist positions were filled in early September 2011.  On September 15, 2011, after PACT selections had been made, Dr. Justice informed the plaintiffs that the Standards Board had denied their advanced scope applications on two grounds: (1) their current positions did not require them to maintain an advanced scope or have prescriptive authority, and (2) there was insufficient data available to complete a Focused Professional Practice Evaluation of direct patient care activities.  Dr. Justice clarified that the second reason for denying the plaintiffs' advanced scope applications meant that the plaintiffs had not received sufficient training.  This was the first time Bay Pines had ever denied an advanced scope application.

## I.    Discrimination Complaints and Reassignment

On August 30, 2011, just before PACT selections were made, the plaintiffs made their initial contact with an Equal Employment Opportunity ("EEO") counselor and asserted that they were the victims of gender and age discrimination. On September 26, 2011, following their non-selection for the PACT pharmacist positions, Bay Pines reassigned the plaintiffs to the outpatient float pool.  While their reassignments did not affect their salary or their grades, the plaintiffs no longer spoke with physicians or consulted patients.  Instead, as float pharmacists, the plaintiffs performed a "dispensing job" as if they were "on an assembly line."

17

The plaintiffs believed their reassignments resulted in a loss of "prestige and responsibility."

On October 12, 2011, Dr. Truitt and Dr. Trask each filed a formal complaint of discrimination with the VA. Dr. Truitt subsequently received her 2011 performance review, which rated her compliance performance as "fully successful" rather than "exceptional." Dr. Trask also testified that in May and June of 2012, just after the parties had provided EEO investigation testimony that spring, management did not allow her to attend certain committee meetings as a union representative.

## II.    PROCEDURAL HISTORY

On August 2, 2013, the plaintiffs filed a second amended complaint in federal district court against the VA alleging causes of action for gender discrimination under Title VII, age discrimination under the ADEA, retaliation, and hostile work environment. In a March 19, 2015 order, the district court granted summary judgment in favor of the VA on all of the plaintiffs' claims. This appeal followed.

## III.    DISCUSSION

### A.    Gender and Age Discrimination

Employment discrimination claims all require proof of discriminatory intent. See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767 (11th Cir. 2005).

18

When, as here, a Title VII or ADEA plaintiff's employment discrimination claim is based on circumstantial evidence, courts apply the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Kidd v. Mando Am. Corp., 731 F.3d 1196, 1202 (11th Cir. 2013) (Title VII); Kragor v. Takeda Pharms. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012) (ADEA).

Under the McDonnell Douglas framework, a plaintiff must first create an inference of discrimination through her prima facie case. Vessels, 408 F.3d at 767. "Once the plaintiff has made a prima facie case, a rebuttable presumption arises that the employer has acted illegally." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). "The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." Id. "If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination." Id.

On appeal, the plaintiffs argue that they established a prima facie case for gender and age discrimination with respect to two discrete adverse employment actions: (1) their non-selection for the PACT pharmacist positions, and (2) the denial of their requests for an advanced scope and associated training. We address each argument in turn.

19

1.     Non-Selection for PACT Pharmacist Positions

In a typical failure-to-hire scenario, the plaintiff establishes a prima facie case of unlawful discrimination by demonstrating that: "(1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002).

To demonstrate that she was qualified for the position at the prima facie stage, a plaintiff must show that she satisfied an employer's objective qualifications. Vessels, 408 F.3d at 769. "[S]ubjective evaluations play no part in the plaintiff's prima facie case." Id. "Rather, they are properly articulated as part of the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently evaluated as part of the court's pretext inquiry." Id.

Here, the plaintiffs failed to demonstrate that they were objectively qualified to fill the PACT pharmacist positions, which is fatal to their prima facie case. It is undisputed that one of the objective hiring criteria for the PACT pharmacist positions was the possession of an advanced scope. Because the PACT initiative required the PACT team pharmacist to function as a mid-level provider who managed chronic disease sates, made critical decisions about the patient's care, and

20

prescribed medications, a PACT pharmacist needed to function under an advanced scope so that he or she could independently prescribe medication.  This objective requirement was made abundantly clear by Bay Pines' PACT pharmacist selections, all of whom had previous experience independently prescribing medication under an advanced scope.

The plaintiffs presented copious amounts of evidence establishing that they were very experienced clinical pharmacists who consistently received outstanding performance reviews.  We have no doubt that the plaintiffs were proficient module pharmacists at Bay Pines.  That said, the plaintiffs did not have advanced scopes and had no experience providing mid-level care with independent prescription authority.  Despite the subjective factors supporting their qualifications to function as PACT pharmacists, the plaintiffs did not possess the objective qualifications necessary to fill the position.   Because the plaintiffs were not objectively qualified to perform the duties of a PACT pharmacist, they failed to establish an element of their prima facie failure-to-hire case.  See Vessels, 408 F.3d at 769; Joe's Stone Crabs, Inc., 296 F.3d at 1273.

2.    Denial of Requests for Advanced Scopes and Related Training

To establish a prima facie case for disparate treatment in an employment discrimination case, the plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her

employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." Burke-Fowler v. Orange Cty., 447 F.3d 1319, 1323 (11th Cir. 2006).

With respect to the third prong of the prima facie case, the plaintiffs and the employee they identify as a comparator must be similarly situated in all relevant respects. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). The comparator must be "nearly identical" to the plaintiffs to prevent courts from second-guessing a reasonable decision by the employer. Id. Thus, in order for the plaintiffs in this case to establish a prima facie case for unlawful disparate treatment, they must show that a similarly-situated individual outside of their protected class applied for an advanced scope and received it. See Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).

The plaintiffs' sole proffered comparator is Dr. Steele, a young male who received an advanced scope and the associated training due to his participation in the Lakeside PACT pilot program. But, compared to the plaintiffs, Dr. Steele was not a "similarly-situated individual." While Dr. Steele was also a module pharmacist, he did not even work in the same building as the plaintiffs. The acting Chief of Primary Care and members of the Bay Pines PACT executive council chose Lakeside as the site for the PACT pilot program. Dr. Steele received an advanced scope and the associated training because he happened to work at

22

Lakeside, the chosen pilot program site.  The plaintiffs did not work at that location.

Dr. Steele was already a module pharmacist at Lakeside and worked with many of the providers selected to participate in the pilot program.  Thus, Dr. Steele was a natural choice for serving as a pharmacist in the Lakeside PACT pilot program.  Once selected to participate in the pilot program, Dr. Steele's job duties required that he train for and obtain an advanced scope.  Conversely, prior to the implementation of PACT, the plaintiffs' jobs never required that they train for or obtain an advanced scope.  As such, Dr. Steele and the plaintiffs were dissimilar in several critical respects, and were a far cry from being "nearly identical."  Wilson, 376 F.3d at 1091.

Simply put, the plaintiffs were module pharmacists in Bay Pines' pre-PACT main campus whose jobs did not require possession of an advanced scope, while Dr. Steele was a pilot-program-participant whose job did require the possession of an advanced scope.  Thus, Dr. Steele was not a valid comparator.

The plaintiffs proffered no comparator other than Dr. Steele.  In fact, the plaintiffs presented no evidence that any other Bay Pines module pharmacist ever applied for an advanced scope so that he or she would qualify for a PACT position.  Because the plaintiffs did not demonstrate that a similarly situated comparator outside of their protected class was given an advanced scope, they failed to

23

establish a prima facie case for unlawful disparate treatment.[3] See Maynard, 342 F.3d at 1289.

Not only did the plaintiffs fail to identify a valid comparator, which is fatal to their prima facie case, but the VA came forward with undisputed evidence that Bay Pines had actually selected Dr. Rolston, a female in her mid-50s, to fill one of the PACT pharmacist positions. For this reason and others, we find no "convincing mosaic of circumstantial evidence" giving rise to an inference of age or gender discrimination. See Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).

## B.    Retaliation

Title VII makes it illegal for "an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The ADEA contains a similar anti-

---

[3]Even if the plaintiffs had established a prima facie case of age and gender discrimination, which they did not, they certainly failed to demonstrate that Bay Pines' reasons for not selecting them for the PACT positions and denying their advanced scope applications were pretexts for unlawful discrimination. This too is fatal to the plaintiffs' claims.

No pharmacist had ever applied for an advanced scope under the circumstances that the plaintiffs did. The plaintiffs concede that they were module pharmacists whose jobs did not require an advanced scope. They only applied for advanced scopes in order to qualify for the PACT pharmacist position, not because Bay Pines had some particular need for more pharmacists with advanced scopes. Given that Bay Pines had no need for additional pharmacists with advanced scopes at the time of the plaintiffs' applications, its denial of their applications was hardly suspect.

24

retaliation provision.  See 29 U.S.C. § 623(d).  To establish a prima facie case of retaliation, plaintiffs must prove that: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  Butler v. Ala. Dep't of Transp., 536 F.3d 1209, 1212-13 (11th Cir. 2008).

"Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action."  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff."  Id.

On appeal, the plaintiffs argue that the district court erred by granting summary judgment in favor of the VA with respect to their retaliation claims.  The plaintiffs contend they suffered four discrete instances of retaliation following their initial August 30, 2011 EEO contact: (1) on September 26, 2011, they were reassigned to the outpatient float pool, (2) at the end of 2011, Dr. Truitt received her annual performance review, which rated her compliance performance as "fully successful" rather than "exceptional," (3) in April 2012, Dr. Truitt had to seek approval from three supervisors to attend a planning committee meeting as a union representative, and (4) in May and June of 2012, pharmacy management did not

permit Dr. Trask to attend committee meetings as a union representative.  As explained below, none of these events constitute an actionable retaliation claim.

1.       Reassignment to Float Pool

We have considerable doubt about whether the plaintiffs' reassignment to the float pool can satisfy the elements of a prima facie retaliation case.  A work reassignment may constitute an adverse employment action when the change is "so substantial and material that it . . . alter[s] the terms, conditions, and privileges of employment."  See Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1245 (11th Cir. 2001) (quotation marks omitted).

Here, the plaintiffs' reassignment resulted in no decrease in pay or grade. And while the plaintiffs offered some subjective evidence that the float pharmacist position involved decreased responsibility and prestige and required the performance of more menial tasks, it is not clear that these changes were so substantial that they amounted to an actionable adverse employment action.  See id.  ("In the vast majority of instances, . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause.").

Additionally, Title VII retaliation claims require proof that "[the] protected activity was a but-for cause of the alleged adverse action by the employer." Univ.

of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. ___, 133 S. Ct. 2517, 2534 (2013).  As early as February 2011, almost eight months before the plaintiffs engaged in their protected activity, pharmacy management stated that pharmacists who were not selected for PACT positions might become floating pharmacists.  Because pharmacy management had already decided to reassign module pharmacists who were not selected for PACT positions to the float pool following the implementation of PACT, the plaintiffs' protected activity could not have been a but-for cause of their reassignment.  See id.

In any event, even assuming arguendo that the plaintiffs' reassignment to the float pool constitutes a prima facie retaliation case, the plaintiffs presented no evidence that the Bay Pines' legitimate non-discriminatory reason for the reassignment was pretextual.  The record evidence demonstrates that the plaintiffs' reassignment to the float pool was a natural consequence of their non-selection for the PACT positions and the elimination of module pharmacist assignments.

Because Bay Pines proffered legitimate non-discriminatory reasons for the plaintiffs' reassignment to the float pool, the plaintiffs had the burden of demonstrating that Bay Pines' reasons were pretextual.  The plaintiffs offer no argument as to how or why this might be the case, let alone point to record evidence demonstrating pretext.  Accordingly, the plaintiffs failed to meet their

burden to show that Bay Pines had retaliatory intent when it reassigned them to the float pool, and the district court properly granted summary judgment on this claim.

2.    Remaining Retaliation Claims

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239. "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id.

Viewed objectively, neither Dr. Truitt's performance review nor the restrictions on Dr. Trask's attendance at committee meetings constitutes an adverse employment action. Dr. Truitt did not suffer an adverse material consequence after receiving a "fully successful" performance review, and Dr. Trask appears to have suffered nothing more than frustration regarding her inability to attend certain meetings. As such, neither of these events constituted a serious and material change in the terms, conditions, or privileges of the plaintiffs' employment. Id.

**C.    Hostile Work Environment**

To establish a hostile work environment claim under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

28

. . . employment and create an abusive working environment."  Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012).  To prove a prima facie case of hostile work environment, a plaintiff must establish that: (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable.  Gupta v. Fla. Board of Regents, 212 F.3d 571, 582 (11th Cir. 2000).

"It is a bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII."  Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012) (quotation marks omitted).  "Therefore, only conduct that is based on a protected category . . . may be considered in a hostile work environment analysis."  Id. (emphasis added) (quotation marks omitted); see also Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 n.3 (11th Cir. 2010) ("[T]he Courts of Appeals have uniformly observed that Title VII is not a civility code, and that harassment must discriminate on the basis of a protected characteristic in order to be actionable.").  "Innocuous statements or conduct, or boorish ones that do not relate to the [age or gender] of the actor or of the offended party (the plaintiff), are not counted."  Jones, 683 F.3d at 1297.

29

The plaintiffs argue on appeal that the district court erred by granting summary judgment in favor of the VA with respect to their hostile work environment claim. The plaintiffs broadly cite to several instances in which pharmacy management behaved rudely and made comments that plaintiffs considered offensive, belittling, and humiliating, most of which involved PACT implementation and union representation. The plaintiffs also cite testimony of other witnesses who believed that the plaintiffs were treated poorly.

The plaintiffs' evidence does not amount to an actionable hostile work environment claim. The plaintiffs' naked assertion that they have been subjected to discriminatory hostile treatment is not sufficient to constitute a hostile work environment. Rather, the plaintiffs must show the hostile treatment was based on their protected status. Jones, 683 F.3d at 1297. Despite the voluminous incidents of pharmacy management's alleged hostility, pharmacy management's comments were never related to the plaintiffs' protected characteristics, and there is no evidence that their alleged hostility was in any way motivated by a discriminatory animus regarding the plaintiffs' age or gender. This alone is fatal to the plaintiffs' claim. See id; Reeves, 594 F.3d at 809 n.3.

Additionally, pharmacy management's comments, though frequently unprofessional, were not "filled with intimidation and ridicule that was sufficiently severe or pervasive to alter [the plaintiffs'] working conditions." Gowski, 682

F.3d at 1313.  Rather, the plaintiffs' struggles exemplify "the ordinary tribulations

of the workplace, which . . . do[es] not constitute actionable . . . harassment."

Gupta, 212 F.3d at 586 (quotation marks omitted).   Accordingly, the district court

properly granted summary judgment in favor of the VA with respect to the

plaintiffs' hostile work environment claim.

## IV.    CONCLUSION

In light of the foregoing, we affirm the district court's order granting

summary judgment in favor of the VA on all of the plaintiffs' claims.

**AFFIRMED.**