[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16329
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-03529-WBH


TAJUANA FRAZIER,

Plaintiff-Appellant,

versus

SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 29, 2017)

Before TJOFLAT, MARCUS, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Tajuana Frazier appeals the district court's grant of summary judgment in favor of the Secretary of the Department of Health and Human Services ("HHS") on her employment discrimination and retaliation claims arising under the Rehabilitation Act of 1973 ("the Rehabilitation Act").[1]  After careful review, we affirm the grant of summary judgment.

## I.

We review *de novo* a district court's order granting summary judgment. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir.), *cert. denied*, 137 S. Ct. 592 (2016).  Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Id.*  An issue of material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the moving party adequately supports its motion for summary judgment, the burden shifts to the non-moving party to identify the specific facts that raise a genuine issue for trial.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).

In determining whether summary judgment was appropriate, we view all evidence and draw all reasonable inferences in favor of the party opposing

---

[1] Frazier also brought concurrent claims under the Americans with Disabilities Act, but that statute, as the district court correctly found, is not available to her because she is a federal employee suing the federal government.  *See* 42 U.S.C. § 12111(5)(B).

summary judgment.  *Id.*    However, inferences based on speculation are not reasonable, and "[e]vidence that is merely colorable, or is not significantly probative of a disputed fact cannot satisfy a party's burden."  *Id.* at 1301 (internal quotation marks omitted).

## II.

In the light most favorable to Frazier, the relevant facts are as follows. Frazier began working for the Centers for Disease Control ("CDC"), a federal agency within HHS, as a contractor in March 2008.  She worked as a transportation assistant in the Global Travel Office of the Center for Global Health, and her duties consisted of processing travel authorizations and country clearances for CDC employees.  In January 2012, the CDC hired Frazier as a full-time employee, and she continued to work as a transportation assistant.  Upon her hire in January, Frazier was placed on a one-year probationary period.

The CDC hired Frazier under its Schedule A hiring authority, which allows the federal government to hire excepted-service employees with disabilities.  *See* 5 C.F.R. § 213.3102(u).  Frazier's disability is type 2 diabetes mellitus, a medical impairment that affects her ability to secrete the hormone insulin.[2]  Because of her diabetes, she has to monitor her glucose levels throughout the day.  As part of the application process, Frazier disclosed that she had diabetes to LaTonya Wright-

---

[2] The district court determined, and HHS does not challenge on appeal, that Fraizer's diabetes is a qualifying "disability" for purposes of the Rehabilitation Act.

3

McBryde, who became her supervisor, and Kay Lawton, who was Wright-McBryde's supervisor.

Frazier's "team leader" in the Global Travel Office was Reginald Powell. Powell was responsible for assigning work to his team and supervising team members. Though Frazier was required to follow his instructions, Powell had no authority to discipline, hire, or fire employees.

In April 2012, Frazier was checking her glucose levels in her office with the door closed when Powell entered without knocking. Frazier informed Powell that she had diabetes, and she asked him for permission to keep her door closed while treating her diabetes. Powell responded that she had to keep her door open. Frazier then went to Wright-McBryde, who was both Powell's and Frazier's supervisor, to explain the situation and make the same request. Wright-McBryde told Frazier that she had no problem with Frazier closing her door to check her glucose levels.

Frazier testified that after she spoke with Wright-McBryde, she began to have problems with Powell. He entered her office without knocking on multiple occasions, and, in her view, he began increasing her workload and giving her more difficult assignments. Frazier also testified that on one occasion in late May 2012, Powell assigned Frazier three assignments while she was on leave, which was contrary to office procedure. Powell later admitted that he made a mistake.

4

On July 11, 2012, after Frazier complained about what she viewed as Powell's inequitable work distribution, Frazier met with Wright-McBryde and Powell. At the meeting, Frazier expressed concern that Powell was assigning her more work than other team members. Wright-McBryde, Powell, and Frazier reviewed statistics showing that the workload was being equitably distributed. Frazier disputes the accuracy of the statistics based on her claim that both Powell and Wright-McBryde had asked her to falsify work statistics in the past. During the meeting, Powell said that he was finding it difficult to work with Frazier and asked to have Frazier moved to a different team. He also stated that Frazier was a Schedule A employee on probation.

In August 2012, Frazier declined to complete a work assignment that had been assigned to her. Frazier did not believe that she was required to complete the assignment because, at the time, she was helping another group with some work, and Powell had told her that he would monitor her inbox for new assignments while she was helping out. At her deposition, Wright-McBryde disagreed with Frazier's understanding of Powell's instructions and explained that the work assigned to Frazier by her own team should have taken priority over helping another team.

5

In September 2012, Lisa Taylor became Frazier's acting supervisor while Wright-McBryde was on maternity leave. Frazier was fired before Wright-McBryde returned from maternity leave in December 2012.

On October 12, 2012, Powell called Frazier to ask her to be acting team leader for a particular week. Frazier was concerned because she had not been officially trained for that role. Frazier then called Lawson to express her belief that Powell was setting her up to fail. Taylor testified that she found Frazier's conduct to be disrespectful because Frazier called Lawton directly about a problem with Powell rather than notifying Taylor, their acting first-line supervisor.

On October 15, 2012, Frazier met with Powell, Lawton, and Taylor. At the meeting, Frazier voiced her concerns about the equitability of work assignments and about Powell's conduct towards her, including entering her office without knocking and constantly reminding her that she was a Schedule A employee on probation. She voiced her belief that Powell was having issues with her disability and that he had been retaliating against her for going "over his head" to Wright-McBryde about closing her office door to check her glucose levels. For his part, Powell told Lawton that he had problems communicating with Frazier.

Lawton instructed Frazier to accept all work assigned to her and further instructed Powell and Frazier to have one-on-one meetings to talk about work

6

issues.  Lawton later asserted that she learned during the meeting that Frazier was not a "team" person.

After the meeting with Frazier, Lawton met separately with Powell and Taylor.  Powell testified that he provided information about Frazier's behavior to Lawton in that separate meeting.

On October 22, 2012, Frazier was considered absent without leave because she did not have a properly submitted leave slip.  Frazier testified that she left a physical request on Powell's desk before leaving, but the document disappeared, and that she put notice that she was out of the office on Powell's calendar.  Powell claimed that he reported Frazier's absence because he did not receive a leave request form from her.  On or around October 29, 2012, Powell asked Frazier to stop complaining to Lawton about him.

Lawton testified that she came to the decision to fire Frazier after hearing about Frazier's problems at work in October 2012.  Lawton stated that there were repeated instances where Frazier failed to follow instructions from her team leader and her supervisor, several instances of her being unprofessional in tone, and one instance of her being absent without leave.  Concerning the failure to follow instructions, Lawton said that she had heard of multiple occasions where Frazier was assigned work and would return it or assign it to someone else.  Lawton did

not personally know of those events and relied on reports from others in reaching the decision to fire Frazier.

Lawton told Wright-McBryde, who was still out on maternity leave, that, after several meetings with Frazier and others, she believed that termination was appropriate.  Lawton asked Wright-McBryde to contact the personnel department so that it could decide whether it was appropriate to fire Frazier.  Wright-McBryde called the personnel department and provided them with necessary documentation and paperwork to approve the decision to terminate Frazier.  On November 2, 2012, Lawton and Taylor called Frazier into Lawton's office, where Lawton gave Frazier a termination letter stating that Frazier was being terminated "based on [her] continued disrespect for authority and [her] failure to follow instructions." Lawton declined to talk about the termination and told Frazier to call the Equal Employment Opportunity Commission ("EEOC") if she had any problems.  Frazier contacted the EEOC immediately after her termination.

Following Frazier's termination, Shaneka Toliver, another CDC employee, told Frazier that Wright-McBryde had contacted a contracting company to see if it had work for Frazier.  Also, according to Toliver, Wright-McBryde said that Frazier was fired "due to no fault of her own" and that Powell "ha[d] his hooks in Ms. Frazier and he was doing all he could to get her fired."

**III.**

8

In November 2014, Frazier filed a three-count complaint against HHS. Frazier alleged that HHS, through the CDC, violated the Rehabilitation Act in three ways: (1) failing to provide a reasonable accommodation for her disability; (2) firing her in retaliation for requesting an accommodation and for complaining about harassment by Powell; (3) and firing her because of her disability. After discovery, HHS moved for summary judgment on all claims.

A magistrate judge issued a comprehensive report and recommendation ("R&R") recommending that HHS's motion for summary judgment be granted. As to the first claim, the magistrate judge found that Frazier's requested accommodation had been granted, not denied. As to the retaliation claim, the magistrate judge found that Frazier had not established a causal connection between her termination and her protected activity for purposes of establishing a *prima facie* case, and that, even if she had, she had not shown that HHS's proffered legitimate reasons for firing her—disrespect for authority and failure to follow instructions—were pretextual. Finally, as to Frazier's discriminatory-firing claim, the magistrate judge found that Frazier had not established pretext for largely the same reasons she failed to do so on her retaliation claim.

Over Frazier's objections, the district court adopted the R&R and granted HHS's motion for summary judgment. Frazier now appeals

**IV.**

9

Frazier's claims arise under the Rehabilitation Act.  Claims brought under the Rehabilitation Act are governed by the same standards used in cases under the Americans with Disabilities Act ("ADA").  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); *see* 29 U.S.C. § 791(f).  Therefore, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."  *Cash*, 231 F.3d at 1305 n.2.

### A.  Failure to Accommodate

The Rehabilitation Act prohibits federal agency employers from discriminating against qualified individuals with disabilities.  *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000).  The plaintiff bears the initial burden of establishing a *prima facie* case of disability discrimination, which requires the plaintiff to establish the following elements: (1) she is disabled; (2) she was a "qualified individual" at the relevant time, meaning she could perform the essential functions of the job in question with or without reasonable accommodations; and (3) she was discriminated against because of her disability.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

"An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer."

10

*Lucas*, 257 F.3d at 1255; *see* 29 U.S.C. § 791(f) (incorporating 42 U.S.C. § 12112(b)(5)(A)).    "Reasonable" accommodations are ones that allow the employee to perform the job's essential functions.  *Lucas*, 257 F.3d at 1255.  In some cases where a disabled employee has requested a reasonable accommodation, the employer and employee must engage in an "interactive process" to determine what accommodations may be necessary.  *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286–87 (11th Cir. 1997); 29 C.F.R. § 1630.2(o)(3).

Here, the district court did not err in granting summary judgment in favor of HHS on Frazier's failure-to-accommodate claim because, after an initial denial by her team leader, her supervisor granted the exact accommodation she requested. Frazier offers no legal support for her contention that HHS can be held liable in circumstances where it granted the requested accommodation despite an initial denial.  To the extent an employer's delay in providing an accommodation could give rise to a claim, Frazier does not contend that she was harmed by the delay in receiving her accommodation, and the record reflects that the delay was short. Accordingly, we see no basis to hold HHS liable for failing to accommodate Frazier's disability or for failing to engage in the interactive process.

For the first time on appeal, Frazier argues that Powell so interfered with her reasonable accommodation by continuing to enter her office without knocking

11

while she checked her glucose levels, as to constitute a denial of her accommodation.  It is well-settled, however, that we will not consider on appeal an issue or argument not fairly presented to the district court except in very limited circumstances.  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598–99 (11th Cir. 1995) (*en banc*); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (listing five exceptional circumstances where this Court may permit an issue to be raised for the first time on appeal).  Because Frazoer did not raise this issue before the district court and it does not meet an exception to our general rule, we decline to address it on appeal.

## B.  Retaliatory Termination

An employer may not retaliate against an employee for opposing any employment practice made unlawful by the ADA.  42 U.S.C. § 12203(a); 29 U.S.C. § 791(f) (incorporating the ADA standards into the Rehabilitation Act); *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 179–80 (2012).  We assess ADA retaliation claims, and thus Rehabilitation Act claims, under the same framework employed for retaliation claims arising under Title VII.  *Stewart*, 117 F.3d at 1287; *see* 29 U.S.C. § 791(f).

To state a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) the protected activity was causally connected to the adverse employment

action. *Stewart*, 117 F.3d at 1287. In general, close temporal proximity between an employer's awareness of protected conduct and an adverse employment action is "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection" for purposes of the *prima facie* case. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Once a *prima facie* case is established, the burden shifts to the employer to put forth a legitimate reason for its actions, after which the plaintiff may show that the proffered reason is a pretext for retaliation. *Id.* Ultimately, the plaintiff must show that the adverse employment action would not have occurred "but for" the protected activity. *Frazier-White*, 818 F.3d at 1258; *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1194 (11th Cir. 2016) (Title VII retaliation claim), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133 (2017).

The district court concluded that Frazier failed to state a *prima facie* case of retaliation. The close acknowledged the temporal proximity between Frazier's protected conduct at the meeting in October—attributing Powell's conduct towards her to retaliatory and discriminatory animus—and her termination a few weeks later in November, which is ordinarily sufficient to give rise to an inference of causation. But the court concluded that the inference had been severed by an "intervening act" of misconduct—Frazier's absence without leave in late October.

13

While that reasoning is sound as a general matter, we are reluctant to adopt it when evaluating a plaintiff's *prima facie* case.

At the *prima facie* stage, the plaintiff "need only establish that the protected activity and the adverse action were not wholly unrelated." *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999) (internal quotation marks omitted). The plaintiff need not definitively establish causation. As we've said before in another context, "the prima facie case is designed to include only evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005) (race discrimination under Title VII). Purported "intervening acts" are unlikely to be "objectively verifiable" in that sense.[3] Rather, such acts are generally offered by the employer as the subjective reasons for its later actions. And in most cases, as here, the plaintiff will argue that the purported intervening act did not occur or that it did not actually motivate the employer's adverse decision—in short, that it was pretextual.

As we see it, the reasoning applied by the district court gives rise to two, equally unsatisfactory, possibilities. First, it may deprive the plaintiff of a meaningful opportunity to challenge the employer's reasons for its actions. *Cf. Vessels*, 408 F.3d at 769 ("If we were to hold an employer's subjective evaluations

---

[3] Our decision in *Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997), sometimes cited as the source of the "intervening act" standard, appears to have been based on the plaintiff's failure to meet objectively verifiable minimal qualifications, not on any intervening act of misconduct.

sufficient to defeat the prima facie case, the court's inquiry would end, and plaintiff would be given no opportunity to demonstrate that the subjective evaluation was pretextual."). And second, even if the plaintiff is not deprived of that opportunity, it still runs the risk of requiring a plaintiff to prove pretext as part of her *prima facie* case. *Id.* ("[W]e cannot reconcile a rule that would essentially require a plaintiff to prove pretext as part of his prima facie case at the summary judgment stage with the Supreme Court's instruction that the plaintiff's prima facie burden is not onerous."); *cf.* (*Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (issues that are "bound up in the inquiry into whether [the employer's] proffered reason . . . was a pretext for discrimination" should be considered "at the pretext stage of the analysis"). Neither possibility is consistent with the general burden-shifting framework we employ in these cases.

Accordingly, we do not evaluate the purported intervening act of misconduct as part of Frazier's *prima facie* case, and we assume that she established a *prima facie* case of retaliation through close temporal proximity. Even assuming the district court erred in this regard, however, the court went on to conclude that Frazier failed to establish that HHS's proffered reasons for her termination—disrespect for authority and failure to follow instructions—were false or that unlawful retaliation was the true reason for her termination. For the reasons explained below, we agree with that determination.

15

Once an employer proffers legitimate reasons for its actions, the plaintiff may demonstrate pretext by showing either that an unlawful reason more likely motivated the employer or that the proffered reason for the decision is not worthy of belief. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). In most cases, a plaintiff can create a triable issue with proof that the employer's explanation is unworthy of credence because "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up [an unlawful] purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–48 (2000). But judgment as a matter of law would still be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination [or retaliation] had occurred." *Id.* at 148.

"When a plaintiff chooses to attack the veracity of the employer's proffered reason, '[the] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1310–11 (11th Cir. 2012) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)); *see also Alvarez*, 610 F.3d at 1266. Provided that the proffered reason is one that might motivate a reasonable employer, the plaintiff "must meet [the] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229

16

F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).  That means that the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Alvarez*, 610 F.3d at 1265 (internal quotation marks omitted).  "[I]t is not our role to second-guess the wisdom of an employer's business decision—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory [or retaliatory] motive."  *Id.* at 1266.  That a plaintiff's evidence suggests that an employment decision was unwise or unfair or inaccurate does not alone suggest that it was discriminatory or retaliatory.  *See id.* at 1266–67.

Here, HHS explained, with supporting evidence, that it discharged Frazier because of instances of disrespect for authority and failure to follow instructions. Frazier contends that a reasonable jury could conclude that the "vague instances" of her not following instructions were made up or exaggerated and that "the purported instances of disrespect were false."  But even if Frazier established that the instances themselves were false or exaggerated, that alone would be insufficient to show pretext "without calling into question [the decision maker's] sincere belief that they occurred."  *See Vessels*, 408 F.3d at 771.  Frazier presents no evidence to show that Lawton, who was the ultimate decision maker, was not informed by her subordinates about these instances or that Lawton did not

17

sincerely believe the information she received.   Whether an employee actually engaged in the misconduct that was reported to the decision maker is irrelevant to the issue of whether the decision maker believed that the employee had done wrong.  *See Elrod*, 939 F.2d at 1470.

Frazier's focus on Powell is misguided because it is undisputed that he was not a decision maker, and Frazier has not argued a "cat's paw" theory of liability either below or on appeal.  *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1334–35 n.6 (11th Cir. 2013) ("'Cat's paw' theory of liability, also referred to as 'subordinate bias theory,' is liability seeking to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."). In fact, the magistrate judge specifically declined to engage in a cat's paw liability analysis, noting that "Frazier has not argued that Defendant is liable under a 'cat's paw' theory."  Magistrate Judge's R&R (Doc. 26) at 29 n.21.  Because Frazier neither objected to that finding nor properly raised the issue on appeal, *see* 11th Cir. R. 3-1 (2015) (failure to object to factual and legal conclusions in an R&R generally waives the right to challenge those conclusions on appeal); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–82 (11th Cir. 2014) (issues not plainly raised on appeal are abandoned), Frazier cannot impute Powell's alleged animus to others for purposes of proving her claim.

18

Frazier next contends that she can show pretext because her supervisors' testimony about whether they knew of her diabetes differs from her own testimony. In Frazier's view, a reasonable jury could conclude from this conflicting testimony that Lawton and McBryde were being untruthful about not only their knowledge of her diabetes, but also their explanation of the reasons for her termination. We disagree.

Whether her supervisors knew of her diabetes has little to do with whether HHS's proffered reasons for her termination are worthy of credence. *See Chapman*, 229 F.3d at 1030. Neither Lawton nor Wright-McBryde based the reasons for their actions on the premise that they did not know of Frazier's disability. So Frazier's contradictory testimony does not meet the proffered reasons "head on and rebut [them]." *See id.* Plus, both Lawton and Wright-McBryde stated that were aware that Frazier was a Schedule A employee with a disability, so it is purely speculative to say that they hid their knowledge of her specific disability in a way that is suggestive of pretext.

Frazier next contends that pretext is shown by HHS's shifting explanations as to who made the decision to terminate Frazier. She cites Lawton's testimony that it was a "joint decision" between Lawton and Wright-McBryde, which, in her view, contradicts Wright-McBryde's testimony that Lawton alone made the decision. But there is no inconsistency between the specific facts of Lawton's and

Wright-McBryde's accounts that is suggestive of pretext. While Lawton at first characterized the decision to fire Frazier as a "joint decision" with Wright-McBryde, Lawton went on to explain that she made the decision to fire Frazier after hearing about Frazier's problems with rejecting work assignments and being absent without leave. She then asked Wright-McBryde to contact the personnel department so that the personnel department could decide whether it was appropriate to fire Frazier. Wright-McBryde provided a similar account, explaining that she did the "logistical leg work" for the termination after Lawton concluded that termination was appropriate. No reasonable jury could conclude from this evidence that either Lawton or Wright-McBryde was being untruthful about the reasons for terminating Frazier's employment.

Based on this same evidence, Frazier argues that, if it was a joint decision, Wright-McBryde's post-termination comments to Toliver, another CDC employee, show that the proffered reasons are pretextual. In particular, Frazier presented evidence that, after her termination, Wright-McBryde told Toliver that Frazier was fired "due to no fault of her own." Wright-McBryde also tried to help Frazier obtain new employment. Frazier compares this situation to that in *Kragor*, where we vacated the grant of summary judgment to an employer based on post-termination comments from the final decision maker which directly contradicted the employer's proffered reasons for the employment action.

20

In *Kragor*, the final decision maker made comments that the plaintiff, who had been fired for allegedly violating or appearing to violate the company's conduct policies, "was an exceptional employee, that she had done nothing wrong, that she had done everything right, and further indicated that she should not have been fired." 702 F.3d at 1310. We held that this evidence was sufficient to show pretext and to survive summary judgment. *See id.* at 1311 ("When the employer's actual decisionmaker, after terminating an employee for misconduct (or the appearance of misconduct), says without qualification that the employee is exceptional, did nothing wrong, did everything right, and should not have been fired, that contradiction—when combined with a prima facie case—is enough to create a jury question on the ultimate issue of discrimination.").

Frazier's reliance on *Kragor* is unavailing for two reasons. First, Wright-McBryde's comments to Toliver do not directly contradict HHS's proffered reasons for Frazier's termination, as in *Kragor*. In the light most favorable to Frazier, Wright-McBryde's comments indicate that she believed Frazier's termination was an unfair consequence of her conflict with Powell. Specifically, according to Toliver, Wright-McBryde believed that Powell "ha[d] his hooks in Ms. Frazier and he was doing all he could to get her fired." But the comments do not reasonably reflect a belief that Frazier followed instructions and behaved appropriately at work during the weeks leading to her termination. Indeed,

21

Wright-McBryde was not present at work during those weeks to make such an observation because she was on maternity leave.

Second, the evidence reflects that Lawton, not Wright-McBryde, was the final decision maker. In the light most favorable to Frazier, Wright-McBryde informed the decision to terminate Frazier's employment and helped prepare and submit the supporting documentation, but it was Lawton who decided that it was appropriate to seek Frazier's termination. And, significantly, Lawton made that decision while Wright-McBryde was out of the office on maternity leave. Wright-McBryde was not privy to the meeting among Frazier, Taylor, Powell, and Lawton in mid-October, or to the meeting thereafter among Taylor, Powell, and Lawton. She also was not present at work when Powell reported to Lawton that Frazier had been absent without leave. As a result, Wright-McBryde's post-termination comments do not contradict Lawton's testimony about the events that led her to conclude that it was appropriate to seek Frazier's termination. Nor is there is any evidence that Wright-McBryde ever communicated to Lawton her belief that Powell was doing all he could to get Frazier fired. For these two reasons, Wright-McBryde's comments after Frazier's termination do not provide sufficient evidence for a reasonable jury to conclude that HHS's reasons are unworthy of credence.

Nor do we see anything else in the record that would permit a reasonable factfinder to conclude that Frazier's protected activity was the but-for cause of her termination. Despite the close temporal proximity between her protected conduct and her termination, HHS's evidence—including evidence that Lawton was informed that Frazier had been absent without leave and that based on her interactions with Frazier, Lawton had concluded that Frazier was not a team person—negated any strong inference of causation that could be drawn from temporal proximity alone. In addition, Frazier's evidence of good job performance does not show pretext because she was not fired for poor job performance, and her evidence predates the events and issues on which her termination decision was based. For this reason, this evidence does not meet HHS's reasons head on and rebut them. *See Chapman*, 229 F.3d at 1030.

Because Frazier has not "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence," *Alvarez*, 610 F.3d at 1265 (internal quotation marks omitted), we affirm the district court's grant of summary judgment on Frazier's retaliation claim.

## C. Discriminatory Termination

23

Frazier also maintains that she has established that HHS's proffered reasons are a pretext for disability discrimination. Besides temporal proximity, her pretext arguments are the same as those presented in support of her retaliation claim. So for the same reasons we have already discussed with regard to her retaliation claim, we find her pretext arguments similarly unpersuasive with regard to her discrimination claim. Frazier has not presented sufficient circumstantial evidence from which a reasonable jury could conclude that HHS's proffered reasons for her termination were pretext for disability discrimination. Accordingly, the district court properly granted summary judgment on this claim.

## V.

For the reasons stated, the district court did not err in granting summary judgment in favor of HHS.

**AFFIRMED.**