[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10484
Non-Argument Calendar

_____

D.C. Docket No. 8:16-cv-01513-CEH-TBM


PATTERSON CEUS,

Plaintiff-Appellant,

versus

CITY OF TAMPA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 3, 2020)

Before WILSON, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

Patterson Ceus, a black male, worked as a Tampa Fire Rescue ("TFR") firefighter from March 2010 until his termination in May 2015.  After TFR terminated him, Ceus sued the City of Tampa (the "City"), alleging TFR retaliated against him for reporting discriminatory activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act ("FCRA").[1] Based on his complaints of discrimination at TFR, Ceus asserts his superiors subjected him to unwarranted scrutiny, disciplined him for alleged misconduct that either did not happen or was only penalized when Ceus engaged in it, downgraded his performance evaluations, and, ultimately, terminated him.

Following discovery, the City moved for summary judgment.  The City asserted, in relevant part, that Ceus did not establish a prima facie case of discrimination, and even assuming he did, that he did not provide sufficient evidence to rebut the City's non-discriminatory explanations as pretext.  The district court granted the City's motion and entered judgment in favor of the city. On appeal, Ceus argues that the district court erred in finding: (1) that his informal internal complaints were not "protected activity" pursuant to Title VII,  (2) that he failed to show his complaints of discrimination were the but-for cause of the

---

[1] Ceus originally alleged both race discrimination and retaliation, but voluntarily dismissed his discrimination claim with prejudice.

2

adverse actions taken against him, and (3) that he could not show sufficient evidence that TFR's reason for his termination was pretext.

Reviewing Ceus's claims *de novo*, we conclude that Ceus did not establish a prima facie case of retaliation. Accordingly, we affirm.

## I. Background

TFR, a department within the City of Tampa and Ceus's former employer, is structured as a paramilitary-style organization.[2] TFR employees follow a strict chain of command: firefighters report to Captains,[3] Captains report to District Chiefs, District Chiefs report to Shift Commanders, and Shift Commanders report to the Fire Chief. Only the Fire Chief can terminate a firefighter, with approval from the director of the City's Human Resources department. Captains and District Chiefs cannot issue formal discipline that results in a loss of pay. Instead, their "disciplinary actions" are limited to reporting objectionable conduct in "DA-52" memos and initiating "career counseling sessions," which they document in "TFR-236" memos.[4]

---

[2] The parties submitted a document containing stipulated facts for their motions for summary judgment. In reciting the facts, we draw generously from this document.

[3] There are three shifts at every TFR fire station—A, B, and C. Each firefighter is assigned one regular shift and one Captain oversees each shift.

[4] Although TFR reports negative conduct in DA-52 and TFR-236 memos, these forms are generally used to document that certain events, like counseling sessions, occurred.

TFR hired Ceus as an entry-level firefighter on March 14, 2010.  Although Ceus claims he was discriminated against from the start, Ceus never complained about any discrimination he allegedly suffered prior to his transfer to Station 18 in March 2013.[5]

A. Station 18

Ceus's initial complaints stem from his paramedic training at Station 18.  In addition to putting out fires, TFR performs Emergency Medical Services ("EMS").  Therefore, TFR requires all firefighters, as a condition of their employment, to obtain their paramedic license within three years of their hire.  Within one year of obtaining that license, firefighters must become departmental paramedics of record ("POR").  A POR is a paramedic who can independently handle a medical issue or emergency.  To become a POR, a firefighter must pass a POR test and complete field training.  Ceus became a certified paramedic in March 2013, as he entered his third year of employment.  Thus, when Ceus arrived at Station 18 in March 2013, he had one year to pass the POR test and complete field training.

In order to help him obtain the necessary field training, Captain Brian Eicholz assigned Ceus to ride as the third person on the station's EMS Rescue during his night shifts, in addition to his non-EMS duties during the day.  If Ceus

---

[5] While he never reported these acts, Ceus nonetheless alleges in his complaint that sometime between March 2010 and March 2011 his former captain said Ceus "sounded like a slave," and joked that he had a pit bull that "only barks at black people."

passed the test, he could train in the second seat.  But Ceus never passed the POR test.  In fact, he failed it nine times.[6]  He therefore continued to ride in the third position.[7]

On June 13, 2013, Captain Eicholz gave Ceus a 32 out of 60 total points—amounting to an "unsatisfactory" score—on his 90-day transfer evaluation. Captain Eicholz identified several issues, including that Ceus communicated poorly with his supervisors, isolated himself from the crew, and abused his use of leave.

On July 16, 2013, Ceus filed his first EEOC race discrimination and retaliation charge for the "treatment at Station 18-C" ("2013 EEOC charge"). Specifically, he complained that Captain Eicholz discriminated against him on the basis of race by making him ride third on the rescue car in addition to his daytime duties.  He also asserted that he was required to work on the rescue car without the premium pay that paramedics normally earn.[8]  The City launched an investigation

---

[6] Ceus refused to retake the test a tenth time because of "stress" and his lawyer's advice not to take the test unless he believed he would pass.  He received a D-52 for his refusal from Division Chief Buckley.

[7] Occasionally, Ceus would "ride up," meaning he would ride in the position of a POR, when a POR was not available.  In those instances, Ceus was eligible for, and received (albeit upon petition to management), premium pay.

[8] In his deposition, Ceus admitted that he does not know any firefighter who received premium pay for riding as a third for training.  Ceus was not eligible for the higher pay because only those riding as a POR or Lieutenant qualified.

5

in response to the 2013 EEOC charge.  At the conclusion of the investigation in August 2013, the City denied any discrimination had occurred.[9]

B. Station 10

In June 2013, Ceus was transferred to Station 10.  Prior to his performance evaluation and EEOC charge, Ceus had submitted a bid to transfer to Station 10, which "was staffed by mostly black firefighters under the command of [then-Captain] Edward Chapman, who was also black."  Before he officially reported to Station 10, Captain Chapman asked Ceus to meet him for breakfast at the Open Café, which is "a black-owned restaurant in a predominately black neighborhood."  Chapman allegedly told Ceus that he chose that restaurant so he "could openly use racial slurs about white people."  At the breakfast, Chapman allegedly asked whether Ceus was "raised around white people" and stated that Ceus "trusted white people too much."  Ceus did not object to those comments at the time.  Nor did Ceus detect any tension during the breakfast.  Rather, Chapman assured Ceus that "we're going to take care of you while you're [at Station 10]."

Although Ceus and Chapman got along well initially, their relationship soon soured.  Both Ceus and Chapman attribute this downturn to an incident on August 14, 2013.  Ceus, while on daytime "light duty" for medical reasons, asked

---

[9] During this litigation, Ceus further alleged Eicholz punished him by assigning him to ride third on the EMS Rescue car for repeatedly failing his POR test.

6

Chapman if he could take sleeping pills.[10] Chapman refused because firefighters are not allowed to sleep during daytime hours unless they have finished their duties. Ceus then informed the City nurse that Chapman would not allow him to take prescribed medication. Chapman, who claims he did not know the sleeping pills were prescribed, drafted a DA-52 memo documenting the order and Ceus's reaction. Ceus claims that Chapman began retaliating against him for contacting the nurse and that Chapman only drafted the DA-52 memo to "cover his ass."

Ceus and Chapman's relationship continued to deteriorate as Chapman repeatedly counseled Ceus regarding performance-related issues. On December 27, 2013 and December 28, 2013, Chapman gave Ceus two separate TFR-236 counseling sessions: one to address unprofessional behavior to a non-TFR crew member during an EMS call and another for repeatedly questioning Chapman's orders. Ceus did not object to the former. With regard to the latter incident, Ceus explained that he did not question Chapman's orders but was upset that Chapman criticized him in front of others.

Despite these incidents, Chapman continued his efforts to help Ceus advance. Chapman met with Ceus on January 8, 2014 to discuss Ceus's goals for

---

[10] "Light Duty" refers to an assignment to tasks around the station that are less demanding than typical station duties due to injury or illness. Ceus was on light duty because of a heart condition.

the new year.[11]  They identified Ceus's short term goal—becoming a POR—and long-term goal—reaching the next career level of Driver Engineer.  In response to the standard DA-52 memo formally documenting the meeting, Ceus wrote:

> I Patterson Ceus don't have any dreams of advancing on this job.  I view this department as a place where dreams go to die.  I have encountered all kinds of discrimination on this job and I have made up my mind that this is a racist department.  I just want to be left alone, and allowed to do my job as a fire fighter.

This response was the first time anyone or anything made Chapman aware that Ceus believed he had encountered racial discrimination.  These comments "shocked" Chapman and he showed the document to his superior, Chief Carroll.

On January 14, 2014, Chapman issued a TFR-236 counseling session regarding Ceus's use of unscheduled leave.  On numerous occasions, Ceus took leave after a scheduled day off, leading to seven to nine days off in a row.  According to the TFR-236 form, Ceus had taken 317.2 hours of unscheduled leave in 12 months.  The maximum allowable under TFR rules is 72 hours per year.  Ceus replied that he did not believe he was abusing his use of leave because he was using sick leave ("SKO") to care for a sick family member.  He explained that, per Chapman's instruction, he had contacted the personnel office for assistance to

---

[11] Chapman meets with all his crew members at the beginning of every year to motivate them in setting annual goals.  He documents these meetings in non-disciplinary DA-52's, individualized for each crew member.

apply for leave under the Family Medical Leave Act ("FMLA")[12] and requested privacy while he dealt with his undisclosed "personal issue." Ceus never submitted the FMLA paperwork and elected not to take FMLA leave but continued to take unscheduled leave.

On January 29, 2014, Ceus emailed Division Chief Shawn Carroll and Personnel Chief David Solorzano, requesting a meeting with Fire Chief Thomas Forward and HR Director Kimberly Crum to discuss "bullying." At the meeting (which Chapman also attended), Ceus told Forward that he was "running a racist department." Chief Forward was "very engaged" with Ceus's objections and tried to inspire Ceus by discussing black firefighters who had risen in the ranks at TFR, including Chief Forward himself.

On February 1, 2014, Chapman completed Ceus's annual performance evaluation, giving him a 31 out of 55 possible points, which amounted to an overall score of "unsatisfactory." Approximately two and a half weeks later, Ceus returned a two-page written response, disagreeing with the evaluation. He claimed the score was based on the August 2014 medication incident and his refusal to sit with Chapman at the station house dining table. Ceus also alleged that discussions at the station house were racially charged and Chapman would "talk negatively"

---

[12] FMLA provides certain employees up to 12 weeks of unpaid, job-protected leave per year for certain family and medical reasons. *See* 29 U.S.C. § 2601.

about TFR employees.  For the first time, Chapman raised Chapman's alleged racist statements at the June 2013 breakfast.  He continued, "the previous racial situation at station 18C and other racial comments that I have heard from personnel within the department has helped me develop my opinion about The City of Tampa Fire Department having a racist issue."

Upon review, Division Chief Carroll agreed with Chapman's evaluation and expressed his disappointment in Ceus's poor response to supervision.  Further, Carroll stated in his comments to the evaluation: "It is obvious to me that [Ceus] is unhappy being a part of Tampa Fire Rescue and has 'made up his mind that this is a racist department.' . . . [I] truly believe that he should find employment elsewhere due to his beliefs."  Carroll explained that he made these comments "based on [his] interactions with Pat . . . He was a very unhappy individual working for Tampa Fire Rescue, and it was obvious to me that -- life is too short to be that miserable."

At some point, the City's Human Resources department investigated the informal allegations against Chapman in Ceus's February 2014 performance evaluation response.  As part of the investigation, the City interviewed all TFR employees at Station 10.  On September 17, 2014, Division Chief Carroll interviewed Ceus regarding his complaint against Chapman.  Ceus alleges that Carroll threatened to put him on a 40-hour work week if he "ke[pt] this shit up,"

which would have been difficult for Ceus because he lived in Miami and commuted to Tampa.

## C. Station 4

Meanwhile, because of his unsatisfactory February 2014 performance evaluation, in March 2014, Ceus was transferred to Station 4 under Captain Gilligan for a 90-day evaluation. Ceus got along well at Station 4 and at the end of the 90-day review period, Gilligan gave Ceus a "satisfactory" performance review with a score of 33.

Four other supervisors cited Ceus for poor job performance, particularly concerning his use of leave, in the months following the vacation time incident. On September 11, 2014, Captain Gilligan issued a TFR-236 counseling session regarding Ceus's failure to report to duty on time and lack of notice ahead of taking leave. According to the TFR-236 session memo, Ceus failed to report to duty by 7:30 A.M. on September 2, 2014 and did not inform Gilligan that he would not be able to make his shift because he was out of town until 8:15 A.M. Gilligan informed Ceus that he was being docked pay for the 45 minutes he was scheduled to work but had not notified Gilligan. And Gilligan placed Ceus on Emergency Annual Leave from 8:15 to the end of his shift at 7:30 A.M. the next day. Gilligan noted Ceus's behavior violated TFR Rules and Regulations and "should never be repeated."

Just over a month later, on October 20, 2014, Acting Division Chief Buckley sent a DA-52 memo to Forward regarding Ceus's "repetitive failings" to complete "specific job requirements" and his unwillingness or inability to comply with TFR's policies and procedures.  In this memo, Buckley detailed Ceus's multiple cancellations of mandatory health physicals, POR test failures, and his inability to complete service trainings.  According to Buckley, these shortcomings were all exacerbated by Ceus's frequent use of exchange of times ("EOT").[13]  Buckley therefore recommended, and Chief Forward approved, denying Ceus additional EOTs until Ceus's performance improved. [14]  At this time, Buckley was not aware of any EEOC charges or internal investigations into other complaints.  In addition, on November 21, 2014, Acting Division Chief Tim Johnson drafted a TFR-236 career counseling session memo regarding Ceus's refusal to shave his goatee in violation of TFR rules.  Ceus received two more similar counseling sessions from Chief Buckley on March 28, 2015, and April 6, 2015.  Finally, on April 12, 2015, Captain Crews provided Ceus a TFR-236 counseling memo for Ceus's failure to report to duty on time without notifying the Station in violation of TFR Rules.

---

[13] An EOT is when firefighters switch their scheduled shifts.  A station captain and/or higher-ranking supervisor must approve an EOT request.  TFR caps the number and frequency a firefighter can use EOTs.

[14] Ceus went through the formal grieving process to address his denial of EOTs.  His grievance was granted and his payroll was corrected to account for the EOT denial.

On September 24, 2014, amid these citations, Ceus filed a second EEOC charge for alleged discrimination and retaliation (the "2014 EEOC charge"), alleging TFR threatened to change his schedule from a "flexible 8 day shift change schedule to a regular daily working schedule, in which no one is assigned to" and was "forcing [Ceus] to obtain a certificate that non-Black firefighters do not have." In the EEOC intake form, Ceus identified several discriminatory actions: the unsatisfactory 2014 performance evaluation (because he "didn't eat ice cream with Chief"), Chapman's use of "racial slurs" during the June 2013 breakfast, that Chapman told employees Ceus would not receive a raise because of the amount of paperwork in his file, that he was accused of the bad acts of others, and finally, that Chapman did not allow him to rest in bed before 4:30 P.M.  In response to the form's inquiry as to the reason for these "discriminatory actions," Ceus wrote that he "was told that racial comments and statements were made 'just because' to me." On January 6, 2015, Personnel Chief Solorzano informed Ceus that the City had completed the investigation into his 2014 EEOC charge against Chapman and "determined that the complaint was unfounded."

D. Return to Station 10 and Termination

Ceus was transferred back to Station 10 in early January 2015, but only worked one shift with Chief Chapman: on January 18, 2015 Chapman was promoted to District Chief.  Chapman kept his personal belongings in a Station 10

13

locker while he awaited his new station assignment.  In February 2015, the lock on Chapman's locker was cut and the locker's contents were placed in a garbage bag on the floor.  According to Captain William Paz, the Station 10 A-shift captain, Ceus admitted to Paz that he cut the lock and put Chapman's belongings in the garbage bag.  Paz told Chapman that Ceus admitted to putting Chapman's possessions in the bag.  Chapman admits he was "upset with Ceus" and reported the incident to his superiors.  But after reporting Ceus, he had no role in the investigation of the incident or any disciplinary decisions.  On March 6, 2015, Paz wrote a DA-52 memo documenting Ceus's admission.  Although Ceus did not sign the DA-52 memo, Captain Paz said he "pretty much owned the conduct."  Ceus maintains that he did not remove the items from Chapman's locker, and he did not admit any wrongdoing to Paz.

On March 2, 2015, Ceus sent a "daman [sic] letter"[15] via email to Kimberly Marple and Kimberly Crum in the City HR department, demanding reimbursement for the "slo" and "skp" time that he was forced to use due to "illegal actions by [his] supervisors."  He added that he would proceed with legal action if he were not reimbursed and would forward his letter to the City of Tampa's attorney.

---

[15] Ceus refers to the March 2, 2015 communication as the "daman" letter in his briefs to this Court.  The subject line of the email reads "daman letter."

Following a pre-disciplinary hearing on May 6, 2015, Chief Forward, with approval from the Director of Human Resources, terminated Ceus for violating:

> Tampa Fire Rescue (TFR) Rules & Regulations (R&R) 102.01 - **Rules of General Conduct** (3) "Employees shall respect and obey all laws and ordinances and the provisions of the department S.O.G., including the Rules and Regulations, duties and procedures," (7) "While on duty, in uniform, or out of uniform, an employee shall display courtesy and respect towards all officers of the department addressing them by their rank and last name."

in addition to:

> City of Tampa's Personnel Manual, B28.2A (3) (b) **Insubordination** (5) "Disorderly or inappropriate physical or verbal conduct," B28.21 (3) (e) **Neglect of Duty** (1) "Causing damage or loss of public or private property and equipment through negligence or willful misconduct," and B28.21 (3) (e) **Breach of Peace** (1) "Being offensive or antagonistic, either physically or verbally, toward any City employee or member of the public at any time."

The Notice of Disciplinary Action identified the grounds for termination, and explained Ceus's "actions as a firefighter, taking it upon [himself] to cut and remove the lock belonging to a superior and removing the items, was without approval, inappropriate, and intentionally antagonistic."

On May 8, 2015, Ceus formally amended his 2014 EEOC charge to add that on March 23, 2015 the City denied his grievance regarding sick leave even though white employees were allowed to have replacements do their work on their sick days so they did not have to use personal time.  He also added that TFR discharged him "for allegedly breaking into the locker of Captain [Chapman]."

15

Ceus filed a complaint against TFR on June 11, 2016, claiming the City discriminated against him on the basis of race in violation of Title VII and § 760.10 Fla. Stat. (Counts 1 and 3) and retaliated against him in violation of Title VII and § 760.10 Fla. Stat. (Counts 2 and 4).  The district court granted the City's motion for summary judgment, finding that Ceus failed to establish a prima facie case of discrimination and also failed to rebut the City's legitimate reason for firing him. Ceus appealed.

## II. Standard of Review

We review a district court's grant of summary judgment *de novo*, viewing all evidence and reasonable factual inferences drawn from it in the light most favorable to the nonmoving party.  *See Crawford v. Carroll*, 529 F. 3d 961, 964 (11th Cir. 2008).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III. Discussion

Both Title VII and the FCRA prohibit employers from retaliating against an employee because that individual engaged in statutorily protected activity, such as

16

reporting racial discrimination.  42 U.S.C. § 2000e-3(a);[16] Fl. Stat. § 760.10;[17]

*Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 273 (2009).

We analyze FCRA claims in the same manner as Title VII claims.  *Harper v.*

*Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).  Where, as here,

the plaintiff does not allege direct evidence of discrimination, we turn to the

framework the Supreme Court established in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  *See Bryant v. Jones*, 575 F. 3d 1281, 1307 (11th Cir. 2009).

Under that framework, the plaintiff must first establish a prima facie case of

retaliation by showing that he: (1) engaged in a statutorily protected activity, (2)

---

[16] In its entirety, 42 U.S.C. § 2000e-3(a), provides:

> Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings[:]
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[17] As relevant here, Fl. Stat. § 760.10 provides:

> It is an unlawful employment practice for an employer, an employment agency, a joint labor-management committee, or a labor organization to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section.

17

suffered a materially adverse action, and (3) established a causal link between the protected activity and the materially adverse action. *Id.* at 1307–08; *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68  (2006).  If these elements are met, the defendant must articulate a legitimate, non-retaliatory reason for the adverse action.  *Bryant*, 575 F. 3d at 1308.  If the employer proffers legitimate, non-retaliatory reasons for a materially adverse action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual.[18]  *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016).   At this point "our inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination."  *Brooks v. Cnty. Comm'n of Jefferson Cnty.¸* 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *EEOC v. Joe's Stone Crab, Inc.*, 296 F.3d 1265, 1272–73 (11th Cir. 2002)).   The plaintiff can establish pretext by showing that the proffered reason for the employment decision was not the true reason.  *Brooks*, 446 F.3d at 1162–63.  To make that showing, the employee must "produce sufficient evidence to allow a reasonable finder of fact to conclude that the [employer's] articulated reasons were not believable."  *Id.* at 1163.  The

---

[18] Although the defendant has the incentive to persuade the factfinder that an employment decision was lawful, "the defendant does not bear a formal burden of persuasion."  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981).  "The ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff."  *Id.* at 253.

18

employee can make such a showing by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. *Id.*

A. Protected Activity

The district court found that Ceus's protected activity was limited to his EEOC charges. Ceus claims that the district court erred in finding none of his internal complaints qualified as statutorily protected activity.

Title VII recognizes two forms of statutorily protected conduct. An employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). 42 U.S.C. § 2000e-3(a).

In order to establish a statutorily protected expression under the opposition clause, a plaintiff must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Furcron*, 843 F.3d at 1311 (quoting *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). The plaintiff's burden under this standard has a subjective and objective component. *Id.* Thus, a plaintiff must allege both that he honestly believed his employer was engaged in unlawful employment practices, and that his

19

belief was objectively reasonable. *Id.* Objective belief is measured against the controlling substantive law. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . [membership in a protected class].'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis omitted).

In order to have engaged in protected activity under the participation clause, the employee must have "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter," that is, subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e–200e-17). 42 U.S.C. § 2000e–3(a). This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).

Ceus's two EEOC charges certainly constitute statutorily protected conduct under the opposition clause. *See Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998) (holding that filing of EEOC charge is protected activity). But Title VII's protections are not limited to individuals who file formal complaints—it protects those who voice informal complaints as well. *Rollins v.*

*State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). Ceus argues the district court erred in finding his internal complaints regarding racism and his participation in investigations launched in response to those complaints were not "protected activities" under Title VII. Ceus points to five additional complaints the district court should have considered: (1) his January 2014 response to the DA-52 Goals memo, (2) his January 2014 "bullying" email and subsequent meeting with Forward and other superiors (3) his February 2014 response to the annual performance evaluation, (4) his September 2014 interview with Carroll (in response to Ceus's internal complaints about Chapman, during which Carroll threatened him with a 40-hour workweek), and (5) his March 2015 "daman" email. None is protected activity.

1.    *January 2014 Response to DA-52 Goals Memo*

Ceus's January 2014 response to the DA-52 Goals Memo states:

> I, Patterson Ceus don't have any dreams of advancing on this job. I view this department as a place where dreams go to die. I have encountered all kinds of discrimination on this job, and I have made up my mind that this is a racist department. I just want to be left alone and allowed to do my job as a firefighter.

In submitting these comments, Ceus did not engage in a protected activity. In order to be protected, the employee's "opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Little*, 103 F.3d at 959. And, in light of the facts and the record

21

presented, the employee must have a good faith, reasonable belief that his employer was engaged in an unlawful discriminatory practice. *Id.* at 960. Here, Ceus does not allege that TFR took any unlawful employment actions: although Ceus generally decries racism within TFR, Ceus does not tie that assertion to any specific discrimination he or anyone else employed by TFR faced. Because Ceus's January 2014 response to the DA-52 Goals Memo was not directed at what he reasonably could have believed was an unlawful employment practice, it does not constitute a protected activity.

2.    *January 2014 "Bullying" Email*

Ceus's January 2014 email requesting a meeting was also not protected activity because it did not mention race or discrimination, as Ceus admits, but merely the unfair treatment of "bullying." *Furcron*, 843 F.3d at 1311; *Coutu*, 47 F.3d at 1074.

Ceus's claim that the meeting with Chief Forward and Captain Chapman in response to the "bullying" email is protected activity also fails. In that meeting, Ceus reiterated that he believed TFR is a "racist department," but made no mention of any discrimination or adverse action that he or anyone else employed by TFR faced. Accordingly, his January 2014 email and the responsive meeting are not protected activity.

3.    *February 2014 Response to Annual Performance Evaluation*

22

In his response to his February 2014 performance evaluation, Ceus attributed his low score to "a personal issue" Chapman had against him "from an incident that occurred while [he] was on light duty [,]" referring to the August 2013 medication incident.  Ceus also raised Chapman's alleged statements concerning white people and states that he believes TFR has "a racist issue."  Neither of these statements make this internal complaint a statutorily protected activity.

With regard to the August 2013 light duty incident, by all accounts, that incident involved a personal disagreement, wholly unrelated to race.  Title VII does not prohibit or regulate workplace issues of civility or personality conflicts. *See Burlington Northern*, 548 U.S. at 68 (noting that Title VII does not set out a "civility code" and that an employee is not immunized from "petty slights or minor annoyances" that are common in the workplace by reporting discriminatory behavior).  Nor does Ceus's allegation that Chapman made racially charged statements about "white people" generally render this allegation protected activity. "[N]ot every uncalled for, ugly, racist statement by a co-worker is an unlawful employment practice." *Butler*, 536 F.3d at 1213.  We held in *Butler* that it was not objectively reasonable for the employee to believe that a single incident where a coworker made an allegedly racist statement that was not aimed at the plaintiff, and was made outside of work and outside of the presence of supervisors amounted to an unlawful employment practice.  *Id.* at 1214.  Here, Ceus complained about a

single incident where Chapman allegedly made negative comments concerning white people. But Chapman allegedly uttered these insults in a restaurant—not at the fire station—and before he became Ceus's supervisor. Moreover, Chapman did not direct his racial comments about white people towards Ceus, who is black. And Ceus does otherwise not tie Chapman's racially charged comments to any specific discrimination he or anyone else employed by TFR faced. For these reasons, Ceus's response to his February 2014 performance evaluation was not a protected activity.

4.    *September 2014 Interview with Carroll*

Ceus's interview in September 2014, as part of the City's internal investigation into his claims regarding Chapman, was not protected activity under either the participation or the opposition clauses of Title VII. It is not protected under the participation clause because TFR did not launch the internal investigation in response to either EEOC charge. Rather, that investigation was connected to Ceus's response to his February 2014 performance evaluation. *See Total System Services, Inc.*, 221 F.3d at 1174. (Title VII's participation clause "does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."). And it is not protected under the opposition clause because Ceus does not allege any specific complaint of discrimination or retaliation that he made during the interview. Thus, Ceus does

24

not show that he "opposed . . . an unlawful employment practice" during the interview. § 2000e–3(a).

Ceus argues that the interview was protected activity under the opposition clause because it was conducted in response to Ceus's internal complaints about Chapman. However, as discussed above, Ceus's complaints against Chapman were not protected activity. Accordingly, the interview that followed these complaints is not entitled to protection under Title VII.

5.    *March 2015 "Daman Letter"*

Finally, Ceus's March 2015 "daman letter," which does not reference race or discrimination, does not fall within Title VII's ambit. In this three-line email to City HR employees, Ceus "demand[s] that the City of Tampa reimburse the [leave] time [he] was forced to use due to illegal actions by [TFR] supervisors." Such a general statement, without more, does not reveal even a subjective belief of discrimination. *See Coutu*, 47 F.3d at 1074 (holding that written grievance was not protected activity because plaintiff offered no proof of discrimination to support her conclusory allegations).

B. Causal Link Between Protected Activity and Adverse Action

We next turn to whether any TFR took any materially adverse action against Ceus because of his protected activity. For an action to be "materially adverse" in the context of retaliation, the action "must be harmful to the point that [it] could

25

well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57.

The district court found that that all but one of the alleged retaliatory actions—his termination—were not adverse because Ceus did not dispute that the other actions were not sufficiently material to constitute adverse employment actions under the law. Therefore, it only considered the possibility that Ceus's termination was an adverse action and found it was not sufficiently close in time to his protected activities—his two EEOC charges—to be causally related. Ceus urges this Court to view all the alleged retaliatory acts holistically and in conjunction with his internal complaints. He asserts five specific retaliatory acts: (1) his transfer from Station 10 to Station 4 in March 2014, (2) Buckley's denial of his EOT requests in October 2014, (3) Carroll's threat to schedule Ceus to work 40-hour workweeks in the September 17, 2014 internal investigation interview, (4) his February 2014 performance evaluation, and (5) his termination in May 2015. In focusing our inquiry on whether the proffered adverse acts are causally related to the protected activity, we assume without deciding that they all had "a materially adverse effect" on Ceus. *Crawford*, 529 F. 3d at 973.

Even if an employee can establish statutorily protected activity and a materially adverse action, he still must show a causal connection between them. *Alvarez*, 610 F. 3d at 1268. In order to establish a causal connection, a plaintiff

26

must show that the decision-maker was aware of the protected activity. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F. 3d 712, 716 (11th Cir. 2002). In addition, the plaintiff must show that the protected activity was a but-for cause of the adverse employment action. *University of Texas Sw. Medical Center v. Nassar*, 570 U.S. 338, 360 (2013); *see also Trask v. Sec'y Dept. of Veteran Affairs*, 822 F. 3d 1179, 1194 (11th Cir. 2016) (noting the same). To show but-for causation, the plaintiff must establish that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action . . . of the employer." *Nassar*, 570 U.S. at 360. "[C]lose temporal proximity between the employee's protected conduct and the materially adverse action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (quotations omitted). We have held that a three to four-month gap in proximity is too long to show causal connection, but that a period of one month "is not too protracted." *Higdon v. Jackson,* 393, F.3d 1211,1220 (11th Cir. 2004). Similarly, causation can be inferred from a series of adverse actions that occurred *immediately* after a plaintiff engaged in a protected activity. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (finding plaintiff met prima facie case where managers knew of her EEOC charge and the series of adverse actions commenced "almost immediately").

27

Ceus cannot show that any of the adverse employment actions he alleged are causally related to his June 2013 and September 2014 EEOC charges.   The record shows that prior to Ceus filing this lawsuit, Chapman, Carroll, and Buckley did not know that Ceus had submitted the 2013 EEOC charge.  Therefore, Chapman's evaluation of Ceus performance in February 2014, Chapman's decision to transfer Ceus in March 2014, Carroll's threat in the September 2014 interview, and Buckley's moratorium on Ceus's EOTs in October 2014 could not have been retaliation for his 2013 EEOC charge.  *See Brungart*, 231 F.3d at 800 (In order to establish a causal relationship between the protected activity and the adverse act, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.").

Nor are any of the allegedly adverse actions causally related to the 2014 EEOC charge.  The February 2014 performance evaluation, the March 2014 transfer, and the September 2014 interview cannot be causally related to the 2014 EEOC charge because they occurred *before* Ceus filed his 2014 EEOC charge. Nor can Ceus trace Buckley's denial of EOTs in October 2014 to his 2014 EEOC charge because Buckley had no knowledge of either EEOC charge.  *See id.*

The only adverse act that is potentially related to an EEOC charge is his termination: Chief Forward was aware of the EEOC charges and terminated him after he filed the charges.  But eight months passed between his most recent EEOC

28

charge on September 24, 2104 and his termination on May 6, 2015.  That gap is too long a period to evince temporal proximity.  *Higdon*, 393 F.3d at 1220.

In sum, Ceus has not shown that TFR took a materially adverse action against him for engaging in a statutorily protected activity.  Therefore, the district court correctly granted summary judgment in favor of the City.

## C. Pretext

Even assuming *arguendo* that Ceus established a prima facie case of discrimination, Ceus has not shown that TFR's true motivation for terminating him was retaliation and its explanations for its actions merely pretext.  The City asserts that it is undisputed that the bases for Ceus's termination contained in Notice of Disciplinary Action—including insubordination, neglect of duty, and breach of peace arising from the locker incident—warrant termination.[19]  But Ceus argues that the City's reliance on the locker vandalism to terminate him was pretext because TFR could not have had a good faith belief that Ceus vandalized Chapman's locker.  His argument hinges on whether Paz lied about Ceus's confession regarding the locker incident.  Ceus claims Captain Paz must have lied because Ceus was not at work on the day that the Notice of Disciplinary Action states he removed the items from Captain Chapman's locker—February 13, 2015.

---

[19] Although he alleges TFR took numerous adverse actions against him, in his brief to this Court, Ceus only attacks the City's explanation for his termination as pretext.

Ceus does not dispute that reported to work on the day Paz reported the alleged confession—February 14, 2015. The City counters that even if Paz lied, Ceus failed to show pretext because Chief Forward and HR Director Crum based their decision on their belief that Ceus committed the acts set forth in Notice of Disciplinary Action.

But Paz never stated that the vandalism occurred on February 13, 2015. Paz's March 6, 2015 DA-52 memo reports that Ceus notified him during a shift change on February 14, 2015 that "he had removed the contents of newly promoted Chief C. Chapman and placed the items from said locker into a garbage bag."[20] Ceus's extensive argument regarding his work schedule is a red herring.

And even if Paz was "lying through his teeth," so long as the decisionmakers, Chief Forward and HR Director Crum, reasonably believed Paz's statements that Ceus admitted to removing the items from the locker, Paz's falsity is not evidence of pretext. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (in evaluating pretext, the court must focus on whether the decisionmakers believed that the employee was guilty of the act and whether that belief was the reason for termination). Ceus did not present any evidence that the

---

[20] The Notice of Termination does report that the incident occurred on February 13, 2015. It is not clear how TFR arrived on this date, but the City claims that it did not draft the Notice based on witness observation. But the exact date the vandalism occurred is immaterial: Ceus worked on February 11, 2015 and on February 14, 2015. He could have broken into the locker at any time on either of those dates before he spoke to Paz on February 14, 2015.

decisionmakers acted dishonestly. Therefore, even if Ceus had established a *prima facie* case of discrimination, his claim would nevertheless fail because he failed to rebut the City's legitimate, nondiscriminatory reasons for terminating him.

Ceus, however, argues that summary judgment would be improper because the internal complaints and the retaliatory acts, internal investigation, and Chapman's antagonism, taken collectively, establish a "convincing mosaic" of evidence that the decisionmaker intentionally discriminated against him. This argument also fails. Chief Forward is the only individual with firing authority at TFR (and even the HR Director must approve the decision). None of the evidence Ceus presented would lead a jury to believe Forward, a black male, intentionally discriminated against Ceus, a black male, who received warning after warning from supervisors regarding his attitude, behavior, and attendance at work.[21] Accordingly, summary judgment was appropriate and we affirm.

## IV. Motion for Sanctions Pursuant to 11th Cir. R. 33-1(f)(2)

On January 3, 2019 the City filed a corrected motion for sanctions against Ceus, pursuant to Eleventh Circuit Rule 33-1(f)(2), requesting attorney's fees and

---

[21] In his brief to this Court, Ceus also argues that causation and pretext can be shown under a "cat's paw" theory. In support of this argument, Ceus asserts that Captain Chapman's discriminatory animus towards Ceus can be imputed to Forward because Forward did not independently investigate the facts supporting his decision to terminate Ceus. But Ceus did not present his "cat's paw" argument to the district court and therefore we need not consider whether Captain Chapman's alleged discriminatory animus can be imputed to Chief Forward's decision to fire Ceus. *Access Now, Inc.*, 385 F.3d at 1331.

31

costs related to the mediation process.  In this Court, "a panel of judges . . . may direct counsel and parties in an appeal to participate in mediation conducted by the court's circuit mediators." 11th Cir. R. 33-1(c)(1).  If a party fails to comply with this rule, "the court may assess reasonable expenses caused by the failure, including attorney's fees; assess all or a portion of the appellate costs; dismiss the appeal; or take such other appropriate action as the circumstances may warrant." R. 33-1(f)(2).  This Court has complete discretion to assess reasonable expenses and attorney's fees.  R. 33-1(f)(2).

The City argues sanctions are warranted because Ceus and his counsel failed to attend two scheduled mediation conferences.  On October 19, 2018—the day of the mediation conference—the City and its attorney appeared by telephone, but Ceus and his attorney did not.  Mediation was then rescheduled for December 11, 2018.  Ceus and his counsel again failed to join the call.  Due to this failure, the City "incurred expense."  The City concludes its request by noting that Ceus's "non-compliance with this Court's rules has been a constant theme throughout this appeal."  Ceus responds that his counsel did not receive any notice regarding the October 19, 2018 mediation and further, he was out of the office on vacation for vacation and work from October 18 through October 29, 2019.  Nor, Ceus contends, did Ceus's counsel receive written notice of the December 11, 2018 meeting.  Further, on that date, he was meeting with the wife of a client who had

32

taken his own life the day before.  Ceus and his counsel maintain that they "did not engage in any intentional misconduct," or deliberately ignore this Court's rules.

While we have discretion to assess attorney's fees and costs, the City did not specify the expenses it bore as a result of Ceus's failure to attend the mediations. Nor did it include an affidavit for attorney's fees or an itemized list of costs.  *See* Fed. R. App. P. 39(d)(1); 11th Cir. R. 39-2(b).  While Ceus and his counsel did violate this Court's rules, there is no evidence of bad faith.  And missing a teleconference (which does not require travel or other expenses) is not so great an offense.  We therefore deny the motion for sanctions.

The judgment below is **AFFIRMED** and the motion for sanctions is **DENIED**.